899 F.2d 814
 20 Envtl. L. Rep. 20,672
 BARCELLOS AND WOLFSEN, INC., et al., Plaintiffs,
and
Boston Ranch Company; Edwin R. O'Neill; West Haven Farming
Co., Plaintiffs-Appellants,
v.
WESTLANDS WATER DISTRICT, et al., Defendants,
and
United States Department of Interior, Defendant-Appellee.
 No. 89-15098.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 4, 1989.
Decided March 16, 1990.
As Amended on Denial of Rehearing and Rehearing En Banc June
7, 1990.
 
 William M. Smiland, Donnelly, Clark, Chase & Smiland, Los Angeles, Cal., for plaintiffs-appellants.
 Robert L. Klarquist, U.S. Dept. of Justice, Washington, D.C., for defendant-appellee.
 Appeal from the United States District Court for the Eastern District of California.
 Before FLETCHER, FERGUSON and FERNANDEZ, Circuit Judges.
 FLETCHER, Circuit Judge:
 
 
 1
 Boston Ranch Company, Edwin R. O'Neill, and West Haven Farming Company appeal the district court's denial of their motion to order the Department of Interior to sell water to them at a certain price pursuant to a contract incorporated into a consent judgment. They argue that Sec. 224(h) of the Reclamation Reform Act of 1982, 43 U.S.C. Sec. 390ww(h), if applied to them, impairs their contract rights and interferes with the consent judgment in violation of due process and the separation of powers required by the Constitution. We affirm the district court.
 
 FACTUAL AND STATUTORY BACKGROUND
 
 2
 This appeal turns on the interpretation of contracts made and a judgment rendered under the aegis of the Reclamation Act of 1902, 32 Stat. 388, and subsequent statutes amending it. The purpose of the original 1902 Act was to encourage people to go West, not to engage in big-time speculation, see Ivanhoe Irrig. Dist. v. McCracken, 357 U.S. 275, 297, 78 S.Ct. 1174, 1186, 2 L.Ed.2d 1313 (1958), but to grow crops on modest family farms in the country's drier regions so that the nation's agricultural bounty would increase. The Act promoted the farming of lands in the arid West by creating a system under which the federal government would provide funds to build water projects from which water would be sold at a subsidized price. The Interior Department was directed to charge water users prices that would recapture the cost of building the project exclusive of interest. 43 U.S.C. Sec. 461. The original 1902 Act allowed this subsidized water to be sold only to resident farmers and only for parcels of land no larger than 160 acres. 43 U.S.C. Sec. 431. But the strict restriction against larger farms inhibited Congress' goal of increasing agricultural production. In 1926 Congress amended the Act to allow Interior to sell water for larger tracts, but only if the owner promised to divest himself of the lands in excess of 160 acres on terms to be worked out by Interior. 43 U.S.C. Sec. 423e.
 
 
 3
 The appellants are landowners. Each owns more than one thousand acres of farm land in California's Central Valley. They buy water from the Westlands Water District (the District). The District and the Department of Interior (Interior) entered into a contract in 1963 (the 1963 Contract), under which the District bought water at a subsidized rate of $8.00 per acre foot (including a $0.50 drainage service component) from a federal reclamation project (the Project) for resale under certain conditions to subscribers within the District. As subscribers, the appellants are beneficiaries of the 1963 Contract, even though they are not parties to it.
 
 
 4
 The 1963 Contract prohibits the District from furnishing Project water to an owner who wishes to use the water to irrigate his "excess lands," or lands in excess of 160 acres,[1] unless the owner agrees in a separate, recordable contract with Interior to certain significant restraints on his rights to the excess lands. Each appellant entered into at least one such recordable contract with Interior between 1969 and 1974.[2] The appellants' recordable contracts are identical except for the description of the owner's particular excess lands.
 
 
 5
 Article 5 of the recordable contracts provides:
 
 
 6
 All rights of the Landowner to receive Project Water for its excess lands shall be subject to the provisions of the District Contract and this contract.
 
 
 7
 Article 25(b)(i) of the District Contract states that as a condition precedent to the right to receive Project water, the landowner shall
 
 
 8
 [agree] to dispose of his land ... to persons who can take title thereto as nonexcess land ... within a period ten (10) years after the date of the execution of said recordable contract and agree[ ] further that if said land is not so disposed of within ... ten years, the Secretary [of Interior] shall have the power to dispose of said land ... on behalf of such large landowner.
 
 
 9
 The District contract and the recordable contracts provide not only that the landowner must sell his excess land within ten years, but also that he must sell at an artificially low appraised price--artificially low because the appraiser may not take into account the fact that the owner of the land has access to water from the Project. Furthermore, the landowner may not sell his excess lands without Interior's approval.
 
 
 10
 Although the contracts give the landowner a ten-year period during which he may transfer his excess lands without being subject to the Secretary of Interior's power of attorney over the lands, Article 13 of the recordable contracts provides:
 
 
 11
 the computation of the ten-year period ... shall not include any year or years in which water or service from the Project may not be available to the land involved through no fault of the District or the Landowner.
 
 
 12
 Article 13 is potentially important to this dispute, because during the ten-year term of the several recordable contracts at issue, events intervened to prevent the contracts from being performed according to the original design.
 
 
 13
 In 1976, a federal district court issued an injunction against the Department of Interior, prohibiting it from approving excess land sales pursuant to recordable contracts until Interior promulgated, in accordance with the Administrative Procedure Act, rules governing the criteria and procedures for approving such sales. National Land for People v. Bureau of Reclamation, 417 F.Supp. 449 (D.D.C.1976). While the injunction was in effect, from 1976 to 1982, the appellants were not permitted to sell their excess lands in the manner envisioned by the recordable contracts. However, only one appellant, O'Neill, attempted to sell.[3]
 
 
 14
 With regard to those excess lands governed by recordable contracts executed prior to 1972, the ten-year period in which to sell expired at some time during the period the injunction was in effect. Nonetheless, during this period, Interior provided Project water at the same rate for lands whose ten years had run as for those whose time had not run. It is disputed whether the contracts required this treatment or whether Interior was simply attempting to act equitably in light of a circumstance (the injunction) unforeseeable at the time it entered into the various contracts with the District and the landowners.
 
 
 15
 The landowners argue that Article 13 must be construed to toll the ten-year period for disposing of land, because Interior's approving excess land sales is a "service." They also argue that if the injunction tolled the ten-year period for disposing of their excess lands, it also provided them with extra time to receive water from the Project at a subsidized price. They point to Article 8 of the recordable contracts, which provides:
 
 
 16
 None of the excess land ... shall be entitled to receive water nor shall service be made available to such land pursuant to the District Contract, except while owned by the Landowner, unless the same shall have been sold to a person who [would be] qualified as a nonexcess landowner to receive Project water ...
 
 
 17
 Appellants argue that Article 8 must be construed to mean that as long as a landowner owns excess lands under recordable contract, he is entitled to receive subsidized Project water for those lands. The merits of these arguments are discussed elsewhere.
 
 
 18
 In 1978, the Solicitor of the Interior Department, Leo Krulitz, issued a legal opinion stating that the $8.00 rate specified in the 1963 Contract was inadequate to recover the escalating costs of the Project and was therefore contrary to the federal reclamation laws, see 43 U.S.C. Sec. 461, and not binding. Op. Solic. 85 Interior Dec. 297 (1978). The Krulitz opinion did not address the question of whether excess lands under recordable contracts for more than ten years should receive Project water at the same price as other land or whether they should receive Project water at all. As a result of the Krulitz opinion, the Interior Department began to charge the District between $13.30 and $16.40 per acre foot for all Project water.
 
 
 19
 In 1979 the appellants sued the District in state court, seeking among other things to have the $8.00 rate enforced. The District joined the United States as a party and removed the action to United States District Court for the Eastern District of California. While the parties were litigating this action, a number of changes in the law occurred.
 
 
 20
 In 1982, partly as a result of the injunction against Interior concerning excess land sales, Congress passed the Reclamation Reform Act of 1982 (RRA), 43 U.S.C. Secs. 390aa et seq., which comprehensively revised reclamation law. The RRA explicitly required Interior to establish rules for disposing of excess lands over which it had a power of attorney, RRA Sec. 209(d), 43 U.S.C. Sec. 390ii(d), and it thus superseded the injunction.
 
 
 21
 The RRA created a new regime of benefits and burdens for excess landowners that would apply to all contracts between Interior and water districts entered into or amended after the date of enactment.[4] It also provided for a transition regime, allowing districts and landowners already parties to contracts with Interior to operate in substantially the same manner as they had under the prior law but with some changes. Section 203(b), 43 U.S.C. Sec. 390cc(b), provided that districts with such existing contracts would be "subject to federal reclamation law in effect immediately prior to the date of enactment of this Act, as that law is amended or supplemented by sections 209 through 230 of this title." Under this transition regime, the landowner would be entitled to receive water at the price provided in the pre-existing contract. Section 203(c), 43 U.S.C. Sec. 390cc(c), allowed a landowner with a pre-existing contract to elect to be treated under the new regime rather than the transition regime. The new regime increased from 160 to 960 acres the amount of land not subject to the burdens imposed on "excess lands," but at the same time it increased the price of water, requiring that water for excess lands (those in excess of 960 acres) be sold at "full cost."[5] These higher excess land limits and provisions for full cost pricing were set forth in Secs. 203-208 of the Act, 43 U.S.C. Secs. 390cc-390hh, and are sometimes referred to as the "discretionary provisions" of the Act because any recipient may choose to come under them.
 
 
 22
 Section 209(e) of the Act, 43 U.S.C. Sec. 390ii(e), governed the effect of the 1976 injunction on pre-existing recordable contracts. It provided that the period of time provided in the contracts for the landowner to dispose of excess lands would "be extended from the date on which the Secretary again commences the processing ... of the disposition of such lands for a period equal to the remaining period of time under the recordable contract for the disposal thereof by the owner at the time [of the injunction]." Section 209(e) did not specify whether the price of water during the extended period would be the old contract rate or the full cost rate.
 
 
 23
 Section 205(c) of the Act, 43 U.S.C. Sec. 390ee(c) provided:
 
 
 24
 Notwithstanding any extension of time of any recordable contract as provided in section 209(e) of this title, lands under recordable contract shall be eligible to receive irrigation water at less than full cost for a period not to exceed ten years from the date such recordable contract was executed by the Secretary in the case of contracts existing prior to the date of enactment of this Act ... Provided, That in no case shall the right to receive water at less than full cost under this subsection terminate sooner than eighteen months after the date on which the Secretary again commences the processing or the approval of the disposition of such lands.
 
 
 25
 Because Sec. 203(b) provided that water recipients with pre-existing contracts were subject to prior law as supplemented by Secs. 209-230, but did not provide explicitly that they were subject exclusively to those provisions, it was unclear whether Sec. 205 applied to those recipients.
 
 
 26
 In May of 1983, shortly after the Act was passed, Interior issued a proposed regulation providing that Sec. 205 did apply to prior law recipients and was thus part of the transition regime.[6] 48 Fed.Reg. 19911, 19913 (May 3, 1983). But in December of 1983, Interior changed its position and issued Final Rule 11(i)(4) providing:
 
 
 27
 Land under recordable contract which is held by a water user not subject to the discretionary provisions may continue to receive irrigation water at the contract water rate for the extended term of the contract....
 
 
 28
 48 Fed.Reg. 54,781 (former 43 C.F.R. Sec. 426.11(i)(4)).
 
 
 29
 In 1984, the appellants' recordable contracts were amended in accordance with Sec. 209(e) to extend the period of time for disposing of their excess lands.[7] The contracts were not amended to reflect the provision in Interior's Final Rule 11(i)(4) that the price of water would remain at the same contract rate during the extended period.
 
 
 30
 Meanwhile, negotiations for a settlement of the underlying 1979 lawsuit were proceeding apace. Congress was interested in the outcome of the lawsuit, and on December 19, 1985 passed section 122 of an appropriations bill, Public Law 99-190, which provided:
 
 
 31
 None of the funds made available by this or any other Act for fiscal year 1986 to the Office of the Secretary, Department of Interior, shall be expended to submit to the United States District Court for Eastern California any settlement with respect to Westlands Water District v. United States, et al.... until (1) April 15, 1986, and (2) until the Congress has received from the Secretary and reviewed for a period of 30 days a copy of the proposed settlement agreement which has been approved and signed by the Secretary.
 
 
 32
 In June of 1986, Interior Solicitor Ralph W. Tarr rescinded the 1978 Krulitz opinion.
 
 
 33
 On July 24, 1986, the parties agreed to a stipulated judgment in the underlying action. Pursuant to P.L. 99-190, Sec. 122, the Secretary submitted the settlement to Congress. The Subcommittee on Water and Power Resources of the House Committee on Interior and Insular Affairs, chaired by Congressman George Miller, held public hearings. Congressman Miller proposed an amendment to an appropriations bill which would have prohibited the settlement, and the amendment passed the House on July 31, 1986. However, the appropriations bill passed by the Senate and enacted into law did not contain the Miller amendment. The thirty days provided in Sec. 122 elapsed.
 
 
 34
 On August 29, 1986 the court entered a stipulated judgment. For our purposes, two aspects of the judgment are relevant. First, the judgment provided for refunds to landowners of all water payments in excess of the $8.00 contract rate made since the time of the Krulitz opinion, including, as per Final Rule 11(i)(4), payments in excess of the $8.00 rate for water used on excess lands controlled by the landowners for the extended period provided in Sec. 209(e) of the Act. Second, the judgment provided that "[t]he 1963 Contract is a valid, enforceable and implementable contract entitling the District through the end of 2007 to water and other service as specified therein," and further provided that "the United States shall perform the 1963 Contract[.]" The judgment was not appealed.
 
 
 35
 In December of 1987, Congress amended the RRA by enacting a new section 224(h), 43 U.S.C. Sec. 390ww(h) which provided:
 
 
 36
 The provisions of section 205(c) are and have been applicable to all recordable contracts executed prior to October 12, 1982 [the date of enactment of the RRA], and any decision, rule, or regulation promulgated by the Department of Interior to the contrary is hereby revoked: Provided, That ... the Secretary shall not seek reimbursement for any amount due under this subsection or section 205(c) which was due prior to the date of enactment of this subsection.
 
 
 37
 On June 10, 1988 Interior published Proposed Rule 11(i)(4)(ii) to implement Sec. 224(h) and overrule the old 11(i)(4). 53 Fed.Reg. 21,857 (1988). On January 17, 1989, the proposed rule became Final Rule 11(i)(4)(ii), which provides:
 
 
 38
 For land under extended recordable contract owned by prior law recipients, water deliveries shall be made at the full-cost rate ... commencing December 23, 1987, through the effective termination date of the extended recordable contract.
 
 
 39
 43 C.F.R. Sec. 426.11(i)(4)(ii).
 
 
 40
 Shortly after Sec. 224(h) was enacted, the appellants brought a motion in the district court to enforce the judgment. They argued that the judgment, in requiring the United States to perform the contract, required Interior to sell water for excess lands under extended-time contracts at the rate of $8.00 per acre foot rather than at the full cost rate of approximately $42.00 that would be required by Sec. 224(h). The motion was essentially one for specific performance of the contract in accordance with the appellants' understanding of the contract. The appellants did not seek compensation for breach of contract. They argued that Sec. 224(h) did not apply to them. In the alternative, they argued that if Sec. 224(h) did apply, it impaired the contract and interfered with the judgment and thus violated due process and the separation of powers required by the Constitution.
 
 
 41
 The court denied the motion in a conclusory manner, without explanation as to how it interpreted the judgment, the underlying contracts, or the applicable statutes. Since all of these interpretative questions are ones of law reviewable de novo, L.K. Comstock & Co. v. United Engineers and Constructors, Inc., 880 F.2d 219, 221 (9th Cir.1989) (contract interpretation); Keith v. Volpe, 784 F.2d 1457, 1461 (9th Cir.1986) (interpretation of consent decree); Vance v. Hegstrom, 793 F.2d 1018, 1022 (9th Cir.1986) (statutory interpretation), we decide the issues without remanding.
 
 DISCUSSION
 A. The Applicability of Sec. 224(h)
 
 42
 The appellants' initial argument is that Sec. 224(h) does not apply to them. They offer two theories for why this is so.
 
 
 43
 First, they argue that because their recordable contracts were amended after October 12, 1982 to conform to the requirements of Sec. 209(e) of the Act,[8] they were not "executed" prior to that date. And, the argument continues, Sec. 224(h) provides that Sec. 205(c) is applicable only to recordable contracts "executed prior to October 12, 1982." This argument has a fundamental flaw. To read the phrase "executed prior to October 12, 1982" to mean "executed prior to October 12, 1982 but not amended after October 12, 1982" would be to render the clause in Sec. 224(h) following that phrase meaningless.[9] That clause states, "and any decision, rule, or regulation to the contrary promulgated by the Department of Interior to the contrary is hereby revoked." The only decision, rule or regulation to the contrary, former 43 C.F.R. Sec. 426.11(i)(4), provided that "land under a recordable contract not subject to the discretionary provisions may continue to receive water at the contract water rate for the extended term of the contract." (Emphasis added.) That extended term derives from Sec. 209(e), and it was pursuant to a regulation that implemented Sec. 209(e) that the recordable contracts were amended to incorporate the extended term. See 43 C.F.R. Sec. 426.11(i)(3). These amendments could only have been made, of course, after the October 12, 1982 date of the RRA's enactment. Thus, to read Sec. 224(h) the way the appellants do would impute to Congress an intent to exempt from a statute that revokes a given regulation those persons who had been virtually the only ones to whom the revoked regulation applied. We do not impute to Congress an intent to engage in an exercise in futility.[10]
 
 
 44
 The appellants' second argument why Sec. 224(h) does not apply to them is specious. They argue that since Congress was aware of the Westlands controversy (having been presented in a previous session with the opportunity to scuttle the 1986 Westlands settlement), the fact that the Westlands Water District was not mentioned by name in Sec. 224(h) implies that Congress intended to exempt landowners in the Westlands District. Section 224(h) provides explicitly that Sec. 205(c) is applicable to "all" recordable contracts, not all except those that Congress had reason to be aware of, and not, as the dissent argues, all except those incorporated into judgments. Section 224(h) clearly applies to the appellants.
 
 
 45
 At oral argument, counsel for the appellants conceded that interpreting Sec. 224(h) to exempt his clients was "stretching it." Appellants nonetheless rely on the canon that if a certain reading of a statute raises "serious" constitutional questions, a court should stretch to find a "fairly possible" alternative construction that will avoid the questions. See Johnson v. Robison, 415 U.S. 361, 366-67, 94 S.Ct. 1160, 1165-66, 39 L.Ed.2d 389 (1974). This canon has its limits; the court need not play the role of contortionist. There is no fairly debatable construction of Sec. 224(h) that would exempt the appellants from its provisions. Moreover, for reasons discussed below, we do not believe that the constitutional questions the appellants raise are sufficiently serious to warrant invoking the canon in any event.
 
 
 46
 B. The Due Process/Impairment of Contract Issue
 
 
 47
 Appellants argue that Sec. 224(h) as applied to them deprives them of property without due process in violation of the fifth amendment by impairing the recordable contracts and the District's contract with Interior.
 
 
 48
 The fifth amendment prohibits the federal government from depriving a person of "property without due process of law." In Lynch v. United States, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934), the Supreme Court held that "[r]ights against the United States arising out of a contract with it" are property rights protected from deprivation or impairment by the fifth amendment.[11]
 
 
 49
 In impairment of contract and due process cases involving contracts, two somewhat different kinds of contracts have been held to create contract rights protected by the constitution. In addition to traditional contracts, assented to in some formal way by both parties, see Lynch, statutes themselves have been treated as contracts, "when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the state." United States Trust Co. v. New Jersey, 431 U.S. 1, 17 n. 13, 97 S.Ct. 1505, 1515 n. 13, 52 L.Ed.2d 92 (1977). See also Indiana ex rel. Anderson v. Brand, 303 U.S. 95, 104-05, 58 S.Ct. 443, 447-48, 82 L.Ed. 685 (1938). The appellants do not claim that the 1982 Act and regulations promulgated thereunder constitute a "contract" impaired in 1987 by the passage of Sec. 224(h). They claim only that the District Contract and the recordable contracts, of their own force, gave them rights that Congress allegedly took away in enacting Sec. 224(h).
 
 
 50
 To prevail in their claim that Sec. 224(h) deprived them of their contract right to water at $8.00 per acre foot for excess lands receiving water for more than ten years, the appellants must first, of course, demonstrate that they had such a contract right before the enactment of Sec. 224(h). See National R. Passenger Corp. v. A.T. & S.F.R. Co., 470 U.S. 451, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985). If they can demonstrate they had such a right, they must then show a substantial impairment of that right. See id. If no substantial impairment is shown, the inquiry ends. See id. In this case, the inquiry ends after the first step. The appellants cannot demonstrate that the right they claim is a right they are entitled to by contract.
 
 
 51
 The appellants make the remarkable argument that, regardless of the reason for the landowner's failure to sell, he is entitled to subsidized water for as long as he owns his lands. They argue that Article 8 of the recordable contracts compels this conclusion. Article 8 provides:
 
 
 52
 None of the excess land ... shall be entitled to receive water nor shall service be made available to such land pursuant to the District Contract, except while owned by the Landowner, unless the same shall have been sold to a person who [would be] qualified as a nonexcess landowner to receive Project water ...
 
 
 53
 Appellants argue that the statement, "None of the excess land ... shall be entitled to receive water ... except while owned by the Landowner" is logically equivalent to the statement, "While excess land is owned by the Landowner, he shall be entitled to receive water." We find this argument unpersuasive. The former statement plainly means that it is a necessary condition for land to receive water that it be owned by the Landowner who executed the recordable contract. The landowners assert that it is a sufficient condition. Appellants have offered no evidence to support their interpretation; the plain language of the contract is otherwise and accordingly controls. We therefore reject the appellants' argument that under Article 8, the landowner's mere ownership of excess lands entitles him to Project water.
 
 
 54
 Thus far, we have determined only that Article 8 does not answer the question of what rights, if any, are given by the contracts to a landowner whose ten years has expired. Unfortunately, no other provision of the contracts unequivocally answers the question. Article 25 of the District Contract comes closest. It provides:
 
 
 55
 (b) Each large landowner as a ... condition precedent to the right to receive water made available pursuant to this contract for any of his excess lands shall:
 
 
 56
 (i) Before any water is furnished by the District to his excess land, execute a valid recordable contract, agreeing ... to dispose of his excess land ... to persons who can take title thereto as nonexcess land ... at a price not to exceed the approved, appraised value of such excess land and within a period of ten (10) years after the date of the execution of said recordable contract[,] and agreeing further that if said land is not so disposed of within ten (10) years, the Secretary shall have the power to dispose of said land at the appraised value ... on behalf of such large landowner.
 
 
 57
 The Article makes a landowner's entering into a recordable contract, wherein he agrees to dispose of his excess lands within ten years, a condition precedent to his right to receive water pursuant to the contract. Appellants would have us read the Article as providing that in order to receive water, a landowner need only execute the contract and need not thereafter take the action required by the contract in order to continue receiving water. We reject such a wooden reading for two reasons. First, it is unlikely that the parties intended or expected that the landowners would make promises and not attempt to perform them. Thus, although the condition precedent to receiving Project water is phrased in terms of the landowner's "agreeing" to dispose of his excess lands within ten years, his failure to abide the agreement should be considered a breach of the condition in order to give the agreement life. Second, it is doubtful that Interior's right to a power of attorney was intended to be its exclusive remedy. The landowner's failure to sell as required by the contract should relieve Interior of the obligation to provide water. If it were otherwise, there would be little or no incentive for the landowner to sell within the prescribed period. The contract provides that the excess lands must be sold at a price determined by appraisers according to a formula that discounts the true market value of the lands by excluding the value of the water rights. The landowner would thus have much to gain by delay (continued cheap water) and little to lose (at most the right to choose the identity of the person who would receive his lands). Contract obligations ordinarily are mutual. There is no reason to read this contract as an exception.
 
 
 58
 Although the District Contract and recordable contracts do not entitle a landowner to receive water for more than ten years if he chooses not to sell his excess lands within that time, it does not necessarily follow that a landowner who is legally precluded from selling his land in the manner provided by the contracts should be deprived of Project water for an extended time. As a result of the injunction against Interior owing to its failure to comply with the APA, the appellants here were legally precluded from selling their lands when their respective ten-year periods expired. We need not decide whether Interior's non-compliance with the APA in its capacity as an administrative agency should be chargeable to Interior in its capacity as a commercial contractor and thus be considered a breach of the water contracts.[12] For even if Interior "breached" the District Contract and recordable contracts by failing to comply with the APA, it does not follow that Interior is constitutionally compelled to provide the landowners with the particular remedy they desire--eight dollar water for as long as they own their lands.
 
 
 59
 The landowners in this suit seek specific performance of a contract that they argue entitles them to subsidized water for as long as they own their lands. They do not seek compensatory damages resulting from Interior's failure to process excess land sales. If they were seeking such damages, relief would be limited to losses they suffered as a result of not having the opportunity to sell their land less the gains they reaped from receiving $8.00 water for a period far longer than they originally could have expected.[13] The question we face is thus quite narrow: whether the appellants have a constitutionally-protected contract right to the particular remedy they seek.
 
 
 60
 The appellants argue that Article 13 of the recordable contracts entitles them to water at the contract rate for more than ten years. Article 13 provides for a tolling of the ten year period to sell excess lands if "water or service from the Project" becomes unavailable during that time. The appellants argue that "service" refers to the service of approving excess land sales and that they are thus entitled by the contract to additional time in which to dispose of their lands. Their interpretation of the word "service" is unsupportable,[14] but even if we accept their interpretation, Article 13 does not entitle them to subsidized water.[15] The appellants need to show more than just their entitlement to own the excess lands for more than ten years free of the Secretary's power of attorney; they need to show their entitlement to Project water under the terms of the contract during that time.
 
 
 61
 Article 13, when properly construed, perhaps at most implicitly provides for the converse relationship between extended ownership and extended water rights. If a landowner were actually to suffer from a cut off of water through no fault of his own, it is arguable that he would be entitled to hold onto his lands for a long enough time to receive the benefit that Article 13 seems intended to confer.
 
 
 62
 The primary benefit that the landowners receive from the federal reclamation program is the privilege of receiving subsidized water. Having to sell their excess lands within a limited period of time at an artificially low appraised price is an intended burden.
 
 
 63
 When Congress passed the Reclamation Act of 1902, it had two goals--to encourage family farming on modest-sized parcels and to increase agricultural output by subsidizing the irrigation of formerly arid and unproductive lands. See Ivanhoe Irrig. Dist. v. McCracken, 357 U.S. 275, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958); United States v. Tulare Lake Canal Co., 535 F.2d 1093 (9th Cir.1976). Because the 1902 Act's attempt to advance the first goal by strictly limiting access to subsidized water to those who owned fewer than 160 acres proved to interfere too much with the second goal, Congress adjusted the balance by amending the Act to authorize Interior to allow larger operators to receive water in exchange for their promise to divest themselves of excess lands. See 43 U.S.C. Sec. 423e.
 
 
 64
 Against this backdrop, Article 13's guarantee to the landowner of subsidized water for the period of time during which he lost that right makes good sense, since the essential benefit to the landowner provided by the contract (and the Act) is cheap water for the specified period of time. It does not follow that in exchange for the temporary loss of the right to sell their excess lands at an artificially low price, the landowners should receive the right to additional years of cheap water. The statutory and contractual scheme suggest that the right to subsidized water is likely to be more valuable than the right to sell lands; otherwise there would be no need to coerce the landowner to sell at the end of ten years--he would do it right away.
 
 
 65
 Other than Article 13, the only contractual provision that the appellants rely on to link ownership with entitlement to subsidized water is Article 8, which we concluded did not so entitle landowners.[16]
 
 
 66
 We have found no provision in either the District Contract or the recordable contracts that provides that the right to receive water on excess lands for more than ten years follows from the right to own them for more than ten years. As we have explained, the very structure of the statutory and contractual scheme suggests otherwise.
 
 
 67
 The landowners' argument that the contracts give them the right to subsidized water for more than ten years thus finds no support either in the language or in the underlying purpose of the contracts. We agree with Interior that the 1963 Contract simply does not provide for the unforeseen situation presented by the injunction against the approval of excess land sales. When the ten-year periods expired, the parties had to deal with the situation without explicit guidance from the contract.[17]
 
 
 68
 In a case where the government is charged by private individuals with breaching its own obligations in violation of the Constitution, "[a]ny ambiguity in the contract must operate against the adventurer and in favor of the public." Charles River Bridge v. Warren Bridge, 36 U.S. (11 Pet.) 420, 544, 9 L.Ed. 773 (1837).[18] Because it was an unforeseen event--the injunction--that prevented the contracts in this case from being performed as planned by either party to them, it is not surprising that the contracts contained no explicit provisions governing the situation in which the parties found themselves.[19]
 
 
 69
 Although we hold that the District contract and the appellants' recordable contracts did not give them any contractual right to receive more than ten years of subsidized water, we do not, however, imply that they lacked any reasonable expectation to receive the water for the extended period of their recordable contracts. Interior's December, 1983 regulations created reasonable expectations that the landowners would be able to receive subsidized water for the extended period, but the regulations did not create constitutionally protectable expectations. A legislature may repeal a statute that created non-contractual expectations as long as there is a rational basis for repeal. See U.S. Railroad Retirement Board v. Fritz, 449 U.S. 166, 174, 101 S.Ct. 453, 459, 66 L.Ed.2d 368 (1980). See also United States v. Sperry Corp., --- U.S. ----, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989). It follows a fortiori that a repeal of regulations under that statute is subject to no greater judicial scrutiny. The appellants do not claim that Sec. 224(h) fails the rational basis test.[20]
 
 
 70
 In sum, since we find that the appellants never had a contractual right to receive more than ten years of water for their excess lands, Congress, in enacting Sec. 224(h), did not deprive them of a property right within the meaning of the fifth amendment.
 
 C. The Separation of Powers
 
 71
 The appellant's next claim is that, in addition to the contracts, the stipulated judgment gave them vested rights which Congress stripped them of in enacting Sec. 224(h). They argue that in so doing, Congress invaded the province of the judiciary and violated the principle of separation of powers.
 
 
 72
 The fifty-six page judgment settled a great number of disputes among the parties involved, concerning, among other things, priorities among various users within the District, drainage facilities, and the issues raised by the 1978 Krulitz opinion. Nowhere does the judgment discuss the issue of the price of water for excess lands under extended term contracts. The judgment requires the United States to perform the 1963 District Contract, but as we have decided, that contract does not govern the particular issue addressed by Sec. 224(h).
 
 
 73
 The appellants argue that because at the time the parties negotiated and entered into the judgment they assumed that Interior Rule 11(i)(4) was a definitive interpretation of the RRA, the judgment therefore incorporated that interpretation of the RRA and bound the parties to it. They argue that reading the judgment to incorporate Interior's rule would be just, because, in reliance on that rule, they provided valuable consideration in the form of forfeited claims.
 
 
 74
 We doubt that even if the parties had expressly incorporated Interior's rule into the judgment, they would be entitled permanently to benefit from it were the law to change. "The parties cannot, by giving each other consideration, purchase from a court of equity a continuing injunction.... The parties could not become the conscience of the equity court and decide once and for all what was equitable and what was not, because the court was not acting to enforce a promise but to enforce a statute." System Federation v. Wright, 364 U.S. 642, 651-53, 81 S.Ct. 368, 373-74, 5 L.Ed.2d 349 (1961). But the judgment does not provide for terms such as those spelled out in Interior's former rule. All the judgment requires is for the 1963 Contract to be performed. We have already held that Sec. 224(h) is not inconsistent with the 1963 Contract.
 
 
 75
 The appellants did not ask the district court to modify or reopen its judgment in light of a purported change in the law.[21] They took the riskier but potentially more lucrative step of claiming the change in law was an unconstitutional act that interfered with the judgment. For the reasons stated above, this claim cannot be sustained.
 
 
 76
 AFFIRMED.
 
 FERNANDEZ, Circuit Judge, dissenting:
 
 77
 This case involves a major reclamation project.[1] We are called upon to determine whether the government has lived up to the provisions of its contracts to supply project water to the appellants. The majority says that it has. I disagree.
 
 
 78
 The reclamation laws are found in Chapter 12 of Title 43 of the United States Code. As they have existed since long before the events that gave rise to this action, they provide for the construction of reclamation projects and the allocation of water from those projects. Reclamation projects are enormous undertakings, and the law reflects that fact. Before a project can be constructed, Interior must submit feasibility reports to Congress. 43 U.S.C. Sec. 485h(a). The reports must set forth, among other things, an analysis of the cost of construction and an estimate of the portion of that cost "which can properly be allocated to irrigation and probably be repaid by the water users...." 43 U.S.C. Sec. 485h(a)(3).
 
 
 79
 The Secretary of the Interior ("Secretary") had the authority to enter into contracts with an appropriate organization for the delivery of water which would ultimately be redelivered to others for use on the land itself. 43 U.S.C. Sec. 485h(d). An appropriate portion of the project construction costs was to be allocated to the organization to which the water was delivered, and spread over a period not to exceed 40 years. 43 U.S.C. Sec. 485h(d). In lieu of that, the construction cost repayment could be accomplished by entering into contracts to supply water "at such rates as in the Secretary's judgment" will produce revenue sufficient to cover an appropriate share of the maintenance and operating costs, and of fixed costs, including a consideration of costs of construction. These water supply contracts can last as long as forty years. 43 U.S.C. Sec. 485h(e).
 
 
 80
 Congress also adopted the policy that reclamation projects should not simply inure to the benefit of large landowners, whether individual or corporate. It desired that those benefits be spread more widely. It therefore decreed that before an owner of over 160 acres could receive project water for the excess lands, a recordable contract for the sale of those lands would have to be entered into between the landowner and the United States. 43 U.S.C. Sec. 423e.
 
 
 81
 A. The Contracts.
 
 
 82
 It ultimately became apparent that the lands which are involved in this action, as well as other lands, would only be properly irrigated if an irrigation project were created. Without a project, it was likely that even existing land would ultimately return to desert, and it was clear that new land would not be developed. See H.Rep. No. 399, 86th Cong., 2d Sess. 2-3, reprinted in 1960 U.S.Code Cong. & Ad.News 2209. That realization led to the San Luis Unit Project, which was approved in 1960. Pub.L. No. 86-488, 74 Stat. 156 (1960).
 
 
 83
 On June 5, 1963, the United States entered into a forty-year contract with the District ("the 1963 contract"), in which it was agreed that water from the project would be supplied to the District. Paragraph 6 of the 1963 contract provided that water would be supplied at the price of $8 per acre foot. That included a $7.50 component for water service and a $.50 component for drainage service.[2] Paragraph 5 of the 1963 contract contemplated that the water would then be delivered to land within the District.
 
 
 84
 There were, however, limitations, and one of those was that the water would not be delivered to excess lands until the landowners had executed recordable contracts with the United States. Landowners had to agree that they would either sell their excess lands within ten years, or that the Secretary would do so after that time through the use of a power of attorney. Paragraphs 23, 24, and 25 of the 1963 contract. As the law provided, the terms and conditions of any sale of the excess lands was subject to the approval of the Secretary.[3] 43 U.S.C. Sec. 423e.
 
 
 85
 Between 1969 and 1974 all of the appellants entered into recordable contracts which conformed with the requirements of the 1963 contract.
 
 
 86
 Notwithstanding the assertions of the majority, there is not even a whisper of evidence that the contracts provided, or were intended to provide, that contract-priced water would be supplied to excess lands for a period of only ten years. One searches the contracts in vain for that language. It simply is not to be found. Instead, as already noted, it is contemplated that landowners who enter into the required contracts will receive water at the contract rate.
 
 
 87
 On its face, the 1963 contract provides that the District is entitled to receive water at the contract rate through the year 2007. The clear contemplation of that contract is that the District will then redistribute that water to the lands entitled to it, at a rate close to the contract price. This is confirmed by paragraph 17.6 of the district court's judgment of December 30, 1986. Non-excess agricultural lands are entitled to the water at those rates. So too are excess lands, if the owners have entered into recordable contracts. See 1963 contract, p 23(a) ("No water made available pursuant to this contract shall be furnished to any excess lands" unless owners execute recordable contracts. Emphasis added). That applies to the appellants in this case, and the 1963 contract does not further restrict their rights.
 
 
 88
 It cannot be gainsaid that the appellants' contracts required them to sell their excess lands within ten years. Thereafter the Secretary could exercise his power of attorney. However, neither the 1963 contract nor the recordable contracts themselves expressly provide for an adjustment in rates between the time that the owner's own disposition period ends and the time that the Secretary exercises his power of attorney to sell the lands. From the end of the disposition period forward, the lands are certainly subject to disposition by the Secretary, if he has taken action. Many factors, including economic conditions, could cause that action to be delayed for a significant period. In the case at hand, we know that for a very substantial time the Secretary placed himself in a position where he could not even approve sales by the owners themselves; other kinds of delays are not difficult to imagine.
 
 
 89
 The lands remained thirsty throughout the delay time, and appellants assert that the thirst was to be slaked with water supplied at the 1963 contract price. Interior assumes that is incorrect, but offers little explanation for its position. The majority asserts that there is no explicit provision that water will be supplied beyond the initial ten year period. It then dubs that an ambiguity and resolves the ambiguity against the appellants. I fail to see that as an ambiguity. What the contract does provide is that water will be supplied at the contract rate during the whole term of the contract. There is not a single word limiting that. Just why the fact that the contracts initially contemplated that holders of excess lands would sell them within ten years should be held to create an ambiguity that must then be summarily resolved against the appellants is not at all clear to me. I fail to see why a party must insist upon having the right to water during the term of the contract reiterated in order to avoid a later claim of ambiguity when the other party decides that it did not make a good deal in the first place.[4]
 
 
 90
 Still, I agree with the majority's apparent assumption that the appellants could breach their contract if they improperly failed to sell during the time that they had to dispose of their excess lands. Appellants recognize that under their recordable contracts they were initially required to dispose of excess lands within ten years after the date that the contracts were entered into. They note that it was not possible to do so because the Secretary stopped approving sales in 1976. That is so, for the United States District Court for the District of Columbia enjoined the Secretary and the Bureau of Reclamation from approving any new contracts for the sale of excess lands until approval criteria and procedures were adopted. See National Land for People, Inc. v. Bureau of Reclamation, 417 F.Supp. 449 (D.D.C.1976). The district court decision was no mere bolt from the blue. It issued because the Secretary had not bothered to follow the procedures that the Administrative Procedure Act imposed upon him. That brought sales of excess land to a halt, since no such procedures were adopted for many years. In other words, the appellants did not breach their agreements. If anyone breached, it was the government. It refused to carry out its end of the agreement that established the procedure for sale of the excess lands. As the majority notes, "[c]ontract obligations ordinarily are mutual." At 822. The government did not fulfill its part of the disposal bargain.
 
 
 91
 Nevertheless, the majority suggests that the Secretary can profit from his own lack of performance by demanding that appellants pay a higher price for water delivered to their excess lands, since they did not sell these lands within ten years. That is a most unusual result, and nothing in the contracts or the law compels it. Had the appellants breached, one could argue that the Secretary could sell the excess lands himself, or stop delivering water, or even, perhaps, refuse to deliver water unless a higher price was paid. See United States v. Quincy-Columbia Basin Irrigation Dist., 649 F.Supp. 487, 492 (E.D.Wash.1986) (Secretary may withhold water from users who fail to comply with reporting requirements). That is not this case, and we need not ruminate about the Secretary's hypothetical remedies were it the case. Here it was the Secretary who was in default.[5]
 
 
 92
 Congress recognized the problems that the Secretary's dilatory conduct had caused. No doubt that is why RRA Sec. 209(e) [43 U.S.C. Sec. 390ii(e) ] allows extension of the period for disposition, an extension that the appellants embraced when they entered into agreements with the United States to extend the period during which they could dispose of their excess lands without the direct intervention of the Secretary.
 
 
 93
 The majority's approach frustrates the policy underlying section 209(e). By enacting this provision, Congress conceded that the 1976-1982 period ought not be counted within the 10-year disposition period. The Senate Report stated: "This section provides for an extension of the 10-year time period for disposal of excess lands subject to existing recordable contracts which is equal to the period of time for which there has been a moratorium on the approval of sales of such lands by the Secretary of the Interior." S.Rep. No. 373, 97th Cong., 2d Sess. 15, reprinted in 1982 U.S.Code Cong. & Ad.News 2570, 2579. The policy behind RRA Sec. 209 assures landowners that they may have the benefit of a full ten years to dispose of their land, during which time the Secretary will continually be prepared to uphold his side of the agreements. The majority notes that one could extend the time to dispose of the land without extending the 1963 contract rate to that period. Slip op. at 2846-47. Of course one could. That position, however, would not consider the economic effects of vastly increasing the cost of water during that time.[6] It would not recognize that the increase could turn a viable agricultural enterprise into a losing proposition and, thus, punish the landowners for the Secretary's own default by preventing them from selling while denying them contract-priced water. Appellants assert that their added cost will be as much as $5,000,000.
 
 
 94
 In sum, it can be said that if the owners themselves refused to sell their excess lands during the time that they had to dispose of those lands, they would be in breach of their contracts. However, there is no evidence that they would not be entitled to the water before that point was reached. Here the landowners could not be said to be in breach of their recordable contracts, as long as the extended period set forth in RRA Sec. 209 [43 U.S.C. Sec. 390ii] was applicable to them. At least during that time, the judgment directed the United States to perform the 1963 contract.
 
 
 95
 It is not necessary to decide whether appellants' right to water at the contract rate extends beyond the time that they will be required to dispose of their lands under the existing recordable contracts. There is no reason to assume that they will not dispose of the lands in accordance with theterms of those contracts. This court need not reflect upon appellants' rights under the 1963 contract, as confirmed and enforced by the December 30, 1986 judgment of the district court, should they fail to do so.[7]
 
 
 96
 Therefore, at the time that Congress added section 224(h) to the RRA [43 U.S.C. Sec. 390ww(h) ] appellants had an existing contract right to receive water for their excess lands at the 1963 contract rate. More than that, they had a judgment which directed that the District and the United States "perform the 1963 Contract" (paragraph 4.1), and which further ordered the District to deliver water to the landowners at the price that it pays the United States, plus its overhead and delivery costs (paragraph 17.6).
 
 
 97
 B. The 1987 Legislation; Separation of Powers.
 
 
 98
 Since the appellants did have contractual rights to receive water, it is necessary to extend this dissent to a discussion of the effect, if any, of section 224(h) [43 U.S.C. Sec. 390ww(h) ][8] upon those rights.
 
 
 99
 As already noted, by the time section 224(h) was enacted, a judgment which directed the United States to abide by the terms of the 1963 contract had been entered in this case. One provision of that judgment made it clear that the water prices were to pass through to the landowners in the District, and nothing in the 1963 contract, the recordable contracts, or the judgment states that excess lands were not entitled to receive the benefits of that pricing.
 
 
 100
 The fact that the judgment was a consent judgment did not change its essential character. It was still a judicial act; it was as sacrosanct as if it had been entered after a full trial--no more, no less. See System Fed'n No. 91 v. Wright, 364 U.S. 642, 650-51, 81 S.Ct. 368, 373, 5 L.Ed.2d 349 (1961); and United States v. Swift & Co., 286 U.S. 106, 114-15, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932).
 
 
 101
 If in the face of the judgment requiring that the 1963 contract be carried out Congress adopted a statute for the purpose of overturning that result, we would be faced with a serious constitutional problem. Congress would then have "passed the limit which separates the legislative from the judicial power." United States v. Klein, 80 U.S. (13 Wall.) 128, 147, 20 L.Ed. 519 (1872). As the Court observed in Pennsylvania v. Wheeling and Belmont Bridge Co., 59 U.S. (18 How.) 421, 431, 15 L.Ed. 435 (1856):
 
 
 102
 [I]t is urged that the act of congress cannot have the effect and operation to annul the judgment of the court already rendered, or the rights determined thereby in favor of the plaintiff. This, as a general proposition, is certainly not to be denied, especially as it respects adjudication upon the private rights of parties. When they have passed into judgment the right becomes absolute, and it is the duty of the court to enforce it.
 
 
 103
 Were Congress to cross that line and attack a judgment that had fixed the rights of the parties, it could trench upon the powers of the judiciary in a manner unknown since the Reconstruction Era problems that spawned Klein. A court should be wary of an invitation to find that Congress has done just that. Rather, it should approach the issues as other courts have in the not far distant past.
 
 
 104
 In Daylo v. Administrator of Veterans' Affairs, 501 F.2d 811 (D.C.Cir.1974), the Administrator claimed that a statute was intended to upset certain judgments which had become final. The court noted that were the administrator correct, it would be faced with a "serious constitutional dilemma." Daylo, 501 F.2d at 816. That was because the legislature simply lacks power to do such a thing, and "[a] contrary general rule would subject all judicial action to superior legislative review, a regime obviously inconsistent with due process of law and subversive of the constitutional independence of the judicial branch of government." Id. The court then went on to note that the judicial branch will construe a statute to avoid a finding of unconstitutionality if the statute can fairly bear that construction. Daylo, 501 F.2d at 819. The court then added the following at page 819 of its Opinion:
 
 
 105
 Furthermore, where a statute lies in the shadow of constitutional doubt, its proper construction will usually require an exploration of legislative history.
 
 
 106
 [W]hen one interpretation of a statute would create a substantial doubt as to the statute's constitutional validity, the courts will avoid that interpretation absent a "clear statement" of a contrary legislative intent.
 
 
 107
 United States v. Thompson, 147 U.S.App.D.C. 1, 5, 452 F.2d 1333, 1337 (1971), cert. denied, 405 U.S. 998, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972).
 
 
 108
 A similar approach was taken by the district court in I.A.M. Nat'l Pension Fund v. Wakefield Indus., Inc., 612 F.Supp. 643 (D.D.C.1985). In that case, a defendant argued that amendment of the statutes regarding withdrawal liability from multi-employer pension plans had overturned a judgment that determined liability in the case before the court. The court noted the constitutional difficulty that would cause, but after applying the Daylo approach it found that it was "both reasonable and consistent to read this provision as excluding any such liability that is reduced to final judgment." I.A.M., 612 F.Supp. at 647 (emphasis in original). It, therefore, had no reason to find that an unconstitutional statute had been adopted.
 
 
 109
 That is a proper approach to statutory construction. Nor can it be said that the judgment in this case is the kind that presents an exception to the general rule. The judgment was not inherently subject to modification by Congress in light of later events. This case is quite unlike Wheeling Bridge, 59 U.S. (18 How.) 421, where the Court had declared that a bridge was an obstruction to interstate commerce and had ordered that it be removed. Congress could, and did, decide that the bridge would not be in violation of past statutes, and that it could be maintained in place. Since Congress was the ultimate competent authority to decide whether a structure would impede or facilitate commerce, it could hardly be said that Congress was not able to do so. Rather, as the Court noted, what used to be an obstruction in contemplation of the law no longer was. The Court, instead, said it was "quite plain the decree of the court cannot be enforced." Wheeling Bridge, 59 U.S. (18 How.) at 432.
 
 
 110
 Similarly, in Hodges v. Snyder, 261 U.S. 600, 43 S.Ct. 435, 67 L.Ed. 819 (1923), the Court approved of legislation that validated the consolidation of a school district after a prior court order had enjoined it. There, too, the law had not provided for the consolidation, but after a court had made its decree, the legislature closed that gap. The Court's decision clearly separated the two aspects of the issue as it was presented. As the Court said in Hodges, 261 U.S. at 603-04, 43 S.Ct. at 436:
 
 
 111
 It is true that, as they contend, the private rights of parties which have been vested by the judgment of a court cannot be taken away by subsequent legislation, but must be thereafter enforced by the court regardless of such legislation....
 
 
 112
 This rule, however, as held in the Wheeling Bridge Case, does not apply to a suit brought for the enforcement of a public right, which, even after it has been established by the judgment of the court, may be annulled by subsequent legislation and should not be thereafter enforced; although, in so far as a private right has been incidentally established by such judgment, as for special damages to the plaintiff or for his costs, it may not be thus taken away.
 
 
 113
 Here we are not dealing with some public right that Congress can change at will. We are dealing with a judgment arising out of very specific contracts, and the only public aspect is that the contracts were with the government. That aspect should make the contracts even less subject to the vicissitudes of legislation. See Perry v. United States, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935); Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934); The Sinking Fund Cases, 99 U.S. 700, 25 L.Ed. 496, 504 (1879). Cf. Norman v. Baltimore & O.R. Co., 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885 (1935). There is no reason to find that the judgment ordering enforcement of the 1963 contract stands on shakier grounds. Rather, this case is more like Daylo, 501 F.2d 811, and I.A.M., 612 F.Supp. 643. Specific and valuable rights are involved, and the judgment deserves enforcement. Application of these principles to this case demonstrates that no constitutional infirmity is shown.
 
 
 114
 There can be little doubt that RRA Sec. 224(h) [43 U.S.C. Sec. 390ww(h) ] was intended to have an effect upon contracts with the United States that existed before the date of its enactment. Its explicit terms make that clear. In that regard, it should be noted that the section refers to RRA Sec. 205(c) [43 U.S.C. Sec. 390ee(c) ]. The latter section did specifically appear to apply to pre-October 12, 1982 contracts, but RRA Sec. 203(b) [43 U.S.C. Sec. 390cc(b) ] made it equally clear that section 205(c) was not applicable to those contracts unless the provisions of section 203(a) or (c) were applicable. There can be no doubt that the appellants in this case did not become subject to those section 203 provisions. If there were a doubt, it has been removed by the parties' stipulation to the contrary.
 
 
 115
 While RRA Sec. 224(h), which was added in 1987, did purport to be a mere construction of the RRA adopted in 1982, it is parlous indeed to determine the intention of the 97th Congress on the basis of what the 100th Congress says that intention was. See Firestone Tire & Rubber Co. v. Bruch, --- U.S. ----, 109 S.Ct. 948, 956, 103 L.Ed.2d 80 (1989); United States v. Price, 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960); and United States v. United Mine Workers, 330 U.S. 258, 282, 67 S.Ct. 677, 690, 91 L.Ed. 884 (1947). The structure of the statute, its very clarity, makes it apparent that its language must control at all times prior to the enactment of RRA Sec. 224(h). Of course, I do not say that Congress was unable to amend the statute. Rather, I say that is precisely what Congress did in 1987. By that amendment, it expressed its intention that the RRA provisions for higher water rates apply to individuals who had contracts which existed before 1982.[9] That being so, I must consider whether the legislation also affected the judgment in this case. It did not.
 
 
 116
 As noted above, RRA Sec. 224(h) was actually a part of the Omnibus Budget Reconciliation Act of 1987, a not unusual budgetary bill with a potpourri of provisions on various subjects. It was a result of many compromises hammered out in a conference committee of the United States Senate and the United States House of Representatives. Neither bill that went to that committee made any reference to this subject. See H.R. 3545, 100th Cong., 1st Sess.,[10] U.S.Code Cong. & Admin.News 1987, 2313-1. I do not say this by way of criticism; I say it by way of noting that there is no material from which we could derive more precise knowledge of legislative intent than the statute itself provides. Certainly that history does not speak to the judgment in this case or to any other judgment entered by the courts of the United States.
 
 
 117
 I recognize that we have been referred to remarks made by Representative Miller at the time the Omnibus Budget Reconciliation Act of 1987 was being considered. 133 Cong.Rec. E4995-96 (daily ed. Dec. 22, 1987). His remarks are interesting.[11] However, they cannot change the construction of the statute. First, it would be quite dangerous to ascribe the opinions of Representative Miller to the whole Congress of the United States, and thereby determine that body's intention on this subject when it passed an enormous budgetary act. Cf. Regan v. Wald, 468 U.S. 222, 237, 104 S.Ct. 3026, 3035, 82 L.Ed.2d 171 (1984). See also Green v. Bock Laundry Mach. Co., --- U.S. ----, 109 S.Ct. 1981, 1994, 104 L.Ed.2d 557 (1989) (Scalia, J., concurring). Second, even Representative Miller did not expressly state that there was an intent to overturn any judgment of a court which had fixed the rights of the parties.
 
 
 118
 I would therefore hold that Congress did not intend to affect the judgment in this case when it enacted RRA Sec. 224(h), and that the enactment of that section did not violate the constitutional provisions which allocate powers between the branches of government.[12] I would also eschew the Secretary's interpretation of that statutory language insofar as he has attempted to apply it to these appellants. While I am aware of the fact that we should usually give deference to administrative interpretations, we do not do so if the interpretations are in conflict with the law. See Public Employees Retirement Sys. v. Betts, --- U.S. ----, 109 S.Ct. 2854, 2863, 106 L.Ed.2d 134 (1989). That is particularly true where, as here, the interpretations would raise serious doubts about the constitutionality of the statute itself. See Daylo, 501 F.2d 811, and I.A.M., 612 F.Supp. 643.
 
 
 119
 It follows that the appellants were entitled to receive water at the rate set forth in the 1963 contract, without regard to the provisions of RRA Sec. 224(h). Moreover, they should not be subject to the provisions of RRA Sec. 205 [43 U.S.C. Sec. 390ee] during the period that they have been given to dispose of their excess lands pursuant to their existing recordable contracts, unless they take action to bring themselves within those provisions in the manner provided in RRA Sec. 203 [43 U.S.C. Sec. 390cc]. As I have already noted, we need not decide whether that right extends beyond the time that they would be required to dispose of their lands under the existing recordable contracts.
 
 
 120
 When these contracts were entered into the appellants had every reason to expect an irenic future in which their labor would combine with ample, reasonably-priced water to produce bountiful crops. That future was not to be. The Secretary's various acts have caused delay, litigation, and greatly increased water prices for a portion of appellants' lands. I would not permit the government to thus break faith with the appellants. I would hold it to its contracts.
 
 
 121
 For these reasons I must respectfully dissent.
 
 
 
 [1]
 320 acres for a husband and wife owning land jointly
 
 
 [2]
 Appellant Boston Ranch executed two recordable contracts in 1972, covering 23,711 acres of excess lands. Appellant O'Neill executed three recordable contracts in 1969 and 1970, covering 974 excess acres. Appellant West Haven Farming Co. executed five recordable contracts in 1973 and 1974, covering 5,556 excess acres
 
 
 [3]
 O'Neill filed a separate lawsuit concerning his right to sell
 
 
 [4]
 It is undisputed that the stipulated judgment is not an amended contract for the purposes of the Act
 
 
 [5]
 The full cost price is calculated to recapture interest on the government's construction costs
 
 
 [6]
 In its entirety, the proposed rule provided:
 A landowner who has land under an extended recordable contract may continue to receive irrigation water for that land at the contract water rate for the full term of the original contract. However, the landowner must pay the full cost rate during the entire extended contract period unless the contract lapsed during the moratorium [i.e. the injunction] or matured within eighteen months of the date the moratorium was lifted. If the maturity date under the original contract lapsed during a moratorium or if the original contract matures within eighteen months of the date a moratorium was lifted, the landowner may receive irrigation water at the contract rate for no more than eighteen months after the processing of excess land resumes. Thereafter the landowner must pay the full cost of the irrigation water delivered during the extension period.
 
 
 [48]
 Fed.Reg. at 19913
 
 
 [7]
 The contracts were extended by approximately eight years, the length of time of the moratorium on excess land sales
 Mr. O'Neill's contract had not been so amended because he was in the process of disposing of his excess lands.
 
 
 [8]
 This argument would not help appellant O'Neill, who did not enter into an amended recordable contract
 
 
 [9]
 This reading would also do violence to the plain language of Sec. 224(h), which does not distinguish between those contracts amended after their initial execution and those not so amended
 
 
 [10]
 The legislative history of Sec. 224(h) supports our conclusion. The conference report stated that the reason for enacting Sec. 224(h) was that lands subject to recordable contracts executed prior to October 12, 1982 "have already received irrigation water for ten years regardless of any extension or suspension of the contract for purposes of disposal of excess lands." H.R.Conf.Rep. No. 495, 100th Cong., 2d Sess. 786. Those extensions or suspensions were embodied in the very amendments that the appellants claim exempt them from Sec. 224(h)
 
 
 [11]
 The Contract Clause of article I, Sec. 10 prohibits states from impairing contracts; the fifth amendment's prohibition against federal impairments is not necessarily coextensive. See Pension Guaranty Corporation v. R.A. Gray & Co., 467 U.S. 717, 732-33, 104 S.Ct. 2709, 2719-20, 81 L.Ed.2d 601 (1984)
 
 
 [12]
 See Horowitz v. United States, 267 U.S. 458, 461, 45 S.Ct. 344, 345, 69 L.Ed. 736 (1925) (noting that "United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign.")
 
 
 [13]
 The landowners received water at the $8.00 rate for far more than ten years, because Congress (and Interior) provided that there would be no interruption of subsidized water while the moratorium on excess land sales was in effect and for an additional eighteen months following the moratorium. See RRA Secs. 205(c), 224(h). The appellants have thus received subsidized water for from 13 to 18 years, depending on when they executed their recordable contracts. We note further that two of the appellants, Boston Ranch and West Haven Farming, never even attempted to sell their excess lands. The third appellant, O'Neill did try to sell and subsequently brought a successful suit in the Court of Claims for compensatory damages
 
 
 [14]
 The interpretation is unsupportable for at least two reasons. First, even if approving of land sales is a "service," it certainly does not come "from the Project," and it is thus not the kind of service envisioned by Article 13. Second, throughout the documents defining the relationship among the landowners, the District, and Interior, "service" appears in contexts where it clearly refers to the service of distributing water and providing drainage facilities to recipients
 
 
 [15]
 Section 209(e) of the RRA has the same effect on the contracts as the appellants' reading of the word "service," and pursuant to Sec. 209(e), the recordable contracts were amended to provide the appellants with extra time to dispose of their lands prior to the maturity of the Secretary's right to invoke a power of attorney. The contracts were not, however, amended to reflect former Interior Rule 11(i)(4) providing for low cost water pricing
 Section 209(e) raises an interpretative problem similar to the problem posed by Article 13: does it by implication provide additional time to receive subsidized water?
 It is ironic that the dissent, while purporting to find a plausible reading of Sec. 224(h) that would avoid constitutional questions, neglects to apply this principle to Sec. 209(e), which is far more ambiguous than Sec. 224(h). Section 209(e) was interpreted two different ways by Interior while the agency was making rules under the RRA, and Congress has seen fit to pass an amendment clarifying its meaning. Although the dissent is correct that it would be "parlous" to give controlling weight to declarations of one Congress' intent by a subsequent Congress, it is not parlous to find Congress' subsequent interpretation relevant to the question whether the previous Congress' provision was ambiguous.
 
 
 [16]
 The dissent argues that Paragraph 17.6 of the Judgment provides the missing link between ownership of and entitlement to subsidized water. But the dissent places too much emphasis on Paragraph 17.6. It provides: "[T]he District shall not charge any water user more for water service or Drainage Service than the charges required to be paid to the United States for such service, plus any [overhead expenses]." The dissent apparently assumes that "the charges required to be paid to the United States" means the contract rate of $8.00. But Paragraph 17.6 states only that the District must charge the users the legally applicable rate and not attempt to profit from its position as the "middleman." The question we face in this appeal is what the legally applicable rate is for users who have received subsidized water for more than ten years. The dissent, in assuming that rate must be the $8.00 contract rate, begs this question
 
 
 [17]
 The dissent seems to assume that Interior bears the burden of proving that the contract does not entitle the landowners to more than ten years of subsidized water. But as challengers to a congressional act, it is the landowners who must prove the existence of the contract right they claim the act has impaired. National R. Passenger Corp., 470 U.S. at 472, 105 S.Ct. at 1455
 
 
 [18]
 In Lynch, 292 U.S. at 579, 54 S.Ct. at 843, the Court held that "when the United States enters into contract relations, its rights and duties are governed generally by the law applicable to private individuals." The law applied is federal law, Priebe & Sons v. United States, 332 U.S. 407, 411, 68 S.Ct. 123, 125, 92 L.Ed. 32 (1947), which includes the Charles River Bridge canon quoted in the text
 The Charles River Bridge rule is simply another way of stating that " governmental contracts 'should be construed, if possible, to avoid foreclosing exercise of sovereign authority.' " Peterson v. Dept. of Interior, 899 F.2d 799, 807 (9th Cir. 1990)(quoting Bowen v. Agencies Opposed to Social Security Entrapment, 477 U.S. 41, 52, 106 S.Ct. 2390, 2397, 91 L.Ed.2d 35 (1986).
 
 
 [19]
 The dissent suggests that a remand might be in order for further factual development of the contract interpretation question. We would not ordinarily quarrel with such a suggestion, but neither party offers any parol evidence to help us interpret the documents at issue. Absent parol evidence, appellate courts are in as good a position as trial courts to interpret documentary evidence
 
 
 [20]
 Section 224(h) by its terms is self-executing and becomes effective immediately upon enactment. The appellants claim that at a minimum they were constitutionally entitled to a "grace period" after the enactment of Sec. 224(h) during which they could continue to receive subsidized water. They rely on cases suggesting that when a legislature imposes a new condition on a person's right to maintain ownership of certain property, the legislature must provide a sufficient period for the person to comply with the condition. See United States v. Locke, 471 U.S. 84, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985); Texaco, Inc. v. Short, 454 U.S. 516, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982). These cases do not govern the present case. In this case, no property right is being conditioned on any particular behavior; there is thus no need for a "grace period."
 
 
 [21]
 We do not imply that Sec. 224(h), in overturning Interior's regulation, necessarily changed the law as Congress had intended it to be applied
 
 
 [1]
 A partial history can be found in California v. United States, 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978). It need not be reiterated here
 
 
 [2]
 The price was intended to reimburse the government for its estimated costs, and was not meant to be a mere giveaway figure. Indeed, we are told that it was the highest price ever charged for water from a project of this sort. Perhaps the Secretary estimated poorly, as contracting parties often do; that should not affect our characterization of the arrangement
 
 
 [3]
 It is proper to note that the 1963 contract was not the result of some arrangement made in the back corridors of an administrative agency that was tricked into it by sly landowners. No one claims that it was. Quite the contrary, it was heralded at the time it was made. In fact, the final approval of the 1963 contract was the subject of a special ceremony at the White House on January 28, 1963. See Remarks at Signing of Water Resources Development Contracts, John F. Kennedy, 1963 Pub. Papers 104. In other words, there is no reason to treat the agreement with disrespect
 
 
 [4]
 If there were truly an ambiguity, I would be dubious about resolving that at our level and without the development of evidence in trial court proceedings. See International Bhd. of Elec. Workers, Local 47 v. Southern California Edison Co., 880 F.2d 104, 107 (9th Cir.1989). I do not believe that we could resolve it by simply relying on a maxim that ambiguities operate against adventurers. For example, there is a further maxim that ambiguous contract provisions are to be construed against the drafter even if the drafter is the government. Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1033 (9th Cir.1989) (citing United States v. Seckinger, 397 U.S. 203, 215-16, 90 S.Ct. 880, 887-88, 25 L.Ed.2d 224 (1970)). Here the drafter of the excess lands provisions was almost certainly the government
 
 
 [5]
 The majority's suggestion that Interior did not default at all, because it simply disabled itself from performing when it failed to pass regulations that would enable it to do so is both intriguing and surprising. It opens up tenebrous vistas of contractual perfidy. Horowitz v. United States, 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736 (1925) is distinguishable. There one Board agreed to ship goods, but another Board decreed that no one could ship that general type of goods. The Supreme Court held that the plaintiff could not claim a breach on the theory that a rule which bound everyone else should not affect his contract. Our case is quite different. Here the Secretary had to approve of sales and the Secretary failed to take proper steps to enable himself to do so
 
 
 [6]
 In this case, for example, the increase was over fivefold, $42 rather than $8
 
 
 [7]
 The question of whether that failure would actually be a breach of contract need not be mooted. Nor need we determine what the Secretary's remedies would be under that now hypothetical circumstance
 
 
 [8]
 Although the section was not originally part of the RRA, it will hereafter be referred to as RRA Sec. 224(h)
 
 
 [9]
 I need not and do not express an opinion on the propriety of legislation which sets out to affect contract rights between the United States and others. Suffice it to say that it presents knotty constitutional problems of its own. See Perry v. United States, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935); Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934); and The Sinking Fund Cases, 99 U.S. 700, 25 L.Ed. 496, 504 (1879)
 
 
 [10]
 The Senate version started as S. 1920, 100th Cong., 1st Sess., but what it sent to the Conference Committee was a much changed version of H.R. 3545
 
 
 [11]
 Representative Miller provided the following rationale in support of the bill:
 [T]he Department, as is far too often the case in its mismanagement of the reclamation program, bowed to heavyhanded lobbying and allowed large landowners in California to receive a windfall worth tens of millions of dollars.
 ... [T]his windfall surely ranks as one of the most egregious giveaways in the history of the reclamation program. This bill will end that giveaway by clearly curtailing the subsidies and saving taxpayers tens of millions of dollars that the administration was prepared to give away.
 
 
 [12]
 The majority seems to suggest that this conclusion is little more than resolution of a claimed statutory ambiguity in the usual sense. See op. at 823 n. 15. I disagree. As the authorities cited in this portion of the dissent indicate, great clarity of purpose should appear before we attribute the intent to overturn judicial decrees to Congress. That is quite different from simply construing a statute to determine whether it applies to a certain set of facts