**MADERA IRRIGATION DISTRICT,
Plaintiff–Appellant,**

**Natural Resources Defense Council,
et al., Intervenors–Appellees,**

**and**

**Chowchilla Water District, Plaintiff,**

v.

**Lawrence F. HANCOCK, as Regional Director of the Mid–Pacific Region of the United States Bureau of Reclamation; Dennis Underwood, as Commissioner of Reclamation, United States Department of the Interior, and; Manuel Lujan, Jr., as Secretary of the Interior of the United States of America, Defendants–Appellees.**

No. 91–16013.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 8, 1992.

Decided Feb. 2, 1993.

As Amended March 8, 1993.

See also 791 F.Supp. 1425.

Denslow Green, Green, Green and Rigby, Madera, CA, for plaintiff-appellant Madera Irr. Dist.

Robert L. Klarquist, U.S. Dept. of Justice, Washington, DC, for defendants-appellees Lawrence F. Hancock, et al.

Brian E. Gray, San Francisco, CA, for intervenors-appellees Natural Resources Defense Council, et al.

Before: ALARCON, HALL, and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

Madera Irrigation District sued for a declaratory judgment and injunction, to prevent the United States from changing the terms of its water purchases when Madera renewed its contract. The district court dismissed for failure to state a claim. We conclude that the government has the power to impose the particular requirements at issue, and affirm.

## I. Facts.

In 1939, Madera Irrigation District sold land and San Joaquin River water rights to the United States. As part of the consideration, the United States promised to build the Friant Dam and the Madera Canal and enter into contracts, when the project was completed, to sell Madera a permanent supply of 270,000 acre feet of water annually. The parties agreed that "it is not possible at this time to fix a price to be paid by the District for said water, but the United States agrees that the cost of said water to the District shall not exceed charges made to others than the District for the same class of water and service from the said Friant Dam and Reservoir." Contract for Purchase of Property and Water Rights at 13 (May 24, 1939) [hereinafter the "1939 Contract"].

In 1951, when construction was done, Madera and the government entered into a forty year contract for purchase and sale of water. They agreed upon a "permanent" supply, but a contract term of forty years. Prices were limited to no more than $3.50 per acre-foot for "class one water," a dependable supply out of the first 800,000 acre feet from the project, and $1.50 for "class two water," a residue to be supplied if available but which was not expected to be as dependable. Under the 1951 contract and "under succeeding contracts the rates to be charged the District for water service shall not exceed charges made to others than the District for the same class of water and service from Friant Dam and Reservoir." Contract Between the United States and the Madera Irrigation District for Water Service and Construction of a Distribution System at 9 (May 14, 1951) [hereinafter the "1951 Contract"]. The 1951 Contract provided that "[t]he executory portions of the 1939 contract ... shall remain in full force and effect." *Id.* at 8.

As the end of the forty year term approached, the parties began negotiation of the renewals. The irrigation district claims that two provisions in the proposed new contract violate its rights under the previous contracts. First, the government insists upon an addition to the rate in the renewal contract of an amount which would recoup the excess of operation and maintenance costs under the 1951 contract over the rates charged during that forty year term. Second, the government insists upon a term in the renewal contract which might require an environmental impact statement and Endangered Species Act consultation, with possible subsequent modifications to the contract.

The dates illuminate the issues. When Madera transferred its land and its water rights to the federal government, federal policy favored reclaiming desert land for agriculture by subsidizing irrigation water, to settle the West and create a class of independent family farmers. *See Peterson v. U.S. Dep't. Interior,* 899 F.2d 799, 802–

807 (9th Cir.), *cert. denied,* 498 U.S. 1003, 111 S.Ct. 567, 112 L.Ed.2d 574 (1990); *Barcellos and Wolfsen v. Westlands Water Dist.,* 899 F.2d 814 (9th Cir.), *cert. denied,* 498 U.S. 998, 111 S.Ct. 555, 112 L.Ed.2d 562 (1990); *United States v. Tulare Lake Canal Co.,* 535 F.2d 1093, 1119 (9th Cir.1976), *cert. denied* 429 U.S. 1121, 97 S.Ct. 1156, 51 L.Ed.2d 571 (1977). As the Great Depression lingered in the late 1930's, Congress and the President may have been more concerned with expanding economic opportunity than avoiding subsidy. Nothing like the National Environmental Policy Act or Endangered Species Act were in the law in 1902 when the Reclamation Act became the law, or 1939 when Madera traded its land and water rights for government promises.

Congress can change federal policy, but it cannot write on a blank slate. The old policies deposit a moraine of contracts, conveyances, expectations and investments. Lives, families, businesses, and towns are built on the basis of the old policies. When Congress changes course, its flexibility is limited by those interests created under the old policies which enjoy legal protection. Fairness toward those who relied on continuation of past policies cuts toward protection. Flexibility, so that government can adapt to changing conditions and changing majority preferences, cuts against. Expectations reasonably based upon constitutionally protected property rights are protected against policy changes by the Fifth Amendment. Those based only on economic and political predictions, not property rights, are not protected. Our task is to determine whether the renewal provisions insisted upon by the government violated Madera's Fifth Amendment property rights.

We review de novo dismissal of an action for failure to state a claim, treating the averments of the complaint as though they were established to test whether, if true, the claim would entitle the plaintiff to relief. *Abbott Bldg. Corp. v. United States,* 951 F.2d 191, 195 n. 8 (9th Cir.1991).

## II. Operation and Maintenance Costs.

The irrigation districts claim that the change in the price term, to recover maintenance and operation costs which were not charged in the 1951–1991 period, is improperly retroactive. The government insists upon a provision in the renewal contract which would recover with interest the subsidy in operations and maintenance costs accumulated during the old forty year contract. In so doing, the executive branch is carrying out a policy enunciated by Congress. Congress passed a statute requiring the recoupment for Central Valley Project irrigation districts such as Madera:

> The Secretary of the Interior shall include in each new or amended contract for the delivery of water from the Central Valley Project provisions ensuring that any annual deficit (outstanding or hereafter arising) incurred by a Central Valley Project water contractor in the payment of operation and maintenance costs of the Central Valley Project is repaid by such contractor under the terms of such new or amended contract together with interest on any such deficit which arises on or after October 1, 1985....

Water Resource and Small Reclamation Projects Act. Pub.L. No. 99–546, § 106, 100 Stat. 3050, 3052 (1986).

Madera was entitled to buy water for a maximum of $3.50 and $1.50 per acre-foot under its 1951 contract. The government conditions renewal on payment during the renewal contract of millions of dollars for operation and maintenance costs incurred during the 1951 contract term. The effect, as Madera sees it, is that it will be paying more than the $3.50 and $1.50 price ceilings for its water purchased under the 1951 contract.

Madera argues that the charges cannot be imposed, for two reasons. First, it had and has a contractual right to pay no more than $3.50 and $1.50 per acre-foot for water under the 1951 contract, and the charges retroactively require it to pay more. Second, it has a contractual right to pay no more for water than other districts, and the charges would cause its price to be higher than that charged to other districts. Madera does not dispute that Congress has

adopted a policy which requires recovery of operations and maintenance costs with interest, and does not urge any construction of the Central Valley Project statute which would exclude Madera's renewal contract from its operation.

 We accept Madera's general proposition that a valid contract right of an irrigation district against the United States is property protected by the Fifth Amendment. *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934); *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003, 104 S.Ct. 2862, 2873, 81 L.Ed.2d 815 (1984). Rights against the United States arising out of a contract are property rights protected from deprivation or impairment by the Fifth Amendment. *Barcellos and Wolfsen, Inc. v. Westlands Water District*, 899 F.2d 814, 821 (9th Cir. 1990). The Due Process Clause limits the exercise of sovereign power which would impair obligations under government contracts. *Alpine Ridge Group v. Kemp*, 955 F.2d 1382, 1387 (9th Cir.), *cert. granted*, — U.S. —, 113 S.Ct. 490, 121 L.Ed.2d 429 (1992). To demonstrate a wrongful taking or impairment, Madera must establish that it has cognizable property rights arising out of its contracts with the government, and that the government has abrogated its contractual rights. *National Railroad Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Corp.*, 470 U.S. 451, 472, 105 S.Ct. 1441, 1455, 84 L.Ed.2d 432 (1985); *Barcellos and Wolfsen*, 899 F.2d at 821.

Two general principles constrain our interpretation. First, we must "construe legislation in a constitutional manner 'if fairly possible.'" *Knapp v. Cardwell*, 667 F.2d 1253, 1260 (9th Cir.) (*quoting Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932)), *cert. denied*, 459 U.S. 1055, 103 S.Ct. 473, 74 L.Ed.2d 621 (1982). Second, we must construe a contract with the government to avoid, if possible, foreclosing the exercise of sovereign authority. Sovereign power " 'will remain intact unless surrendered in unmistakable terms.'" *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52,

106 S.Ct. 2390, 2397, 91 L.Ed.2d 35 (1986) (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982)); *Peterson v. U.S. Dep't of Interior*, 899 F.2d 799, 807 (9th Cir.), *cert. denied*, 498 U.S. 1003, 111 S.Ct. 567, 112 L.Ed.2d 574 (1990). These two principles compel a construction somewhat more liberal toward the government than might be appropriate were the contract a purely private transaction. They enable it to change, not just execute past policies. But too liberal an interpretation of the residual sovereign power of the government to override its contractual commitments would eviscerate the government's power to bind itself to contracts. In addition to the moral offensiveness of allowing the government to break its promises, too liberal a construction would have the paradoxical consequence of weakening the sovereign power to implement policy. *See Perry v. United States*, 294 U.S. 330, 351–54, 55 S.Ct. 432, 435–36, 79 L.Ed. 912 (1935). If the government's commitments need not be honored, then it can induce responses to policies only by cash or coercion.

### A. *Right to Renewal.*

The government offers a broad justification for the operation and maintenance charges and all the other changes at issue which we cannot accept. It urges that Madera had no renewal right under the 1951 contract, so the government was free to offer renewal on any terms. We cannot reconcile that with the terms of the 1939 and 1951 contracts. Madera did not exchange its land and its water rights for a forty year supply of water. It exchanged them, as its 1951 contract recites, for a "permanent" supply of water. Section 4 of the 1951 contract expressly provided for renewal at the expiration of the forty year term and terms for the "succeeding contracts":

> The executory portions of the 1939 contract ... remain and shall remain in full force and effect, and the parties, upon the expiration of the term of Part A hereof, shall be entitled to all of the rights conferred upon them by article 14 of the 1939 contract and shall be subject

to all of the terms and conditions of said article except as the aforesaid 1939 contract may be abrogated or amended by specific reference thereto and mutual agreement of the parties: .... Under this Part A and under succeeding contracts the rates to be charged the District for water service shall not exceed charges made to others than the District for the same class of water and service from Friant Dam and Reservoir.

1951 Contract at 8–9. Section 14 of the 1939 contract provided, *inter alia,* for future purchases of water:

> (e) Whenever the United States shall be prepared to furnish service for irrigation or other purposes from Friant reservoir ..., the United States shall notify the District in writing relative to the availability and character of such service, and shall define the classes and quantities of service then and thereafter to be made available and the respective prices and methods of payment therefor. The District shall have six (6) months from the date of receipt of said notice within which to contract for the purchase of water on the basis of the classes and quantities of service so offered to the District; *provided,* that, having due regard for the District's procedure required or expedient in negotiating for and securing approval of such contract, the Secretary may grant such extensions of time as he deems desirable. It is mutually understood between the parties hereto that it is not possible at this time to fix a price to be paid by the District for said water, but the United States agrees that the cost of said water to the District shall not exceed charges made to others than the District for the same class of water and service from the said Friant Dam and Reservoir.

1939 Contract at 13. Section 4 of the 1951 contract amended the 1939 contract, and as amended, it expressly provides for renewals after the forty year term:

> The District shall have six (6) months [after the termination of Part A [of the 1951 contract] and within six (6) months after the termination of each term provided in succeeding contracts] within

which to contract for the purchase of water on the basis of the classes and quantities of service so offered to the District; *provided,* that, having due regard for the District's procedure required or expedient in negotiating for and securing approval of such contract, the Secretary may grant such extensions of time as he deems desirable.

1939 Contract at 13; 1951 Contract at 8–9. This provision guarantees Madera certain rights after the expiration of the 1951 contract. It has a vested property right to a permanent water supply based on express provisions of its contracts. *Cf. Alpine Ridge Group v. Kemp,* 955 F.2d 1382, 1385–86 (9th Cir.1992). (Express provisions of contract supported by independent consideration, not merely legislative provisions, create vested property rights), *cert. granted,* — U.S. —, 113 S.Ct. 490, 121 L.Ed.2d 429 (1992). The question is not whether its rights exist, but whether they are being violated.

### B. *Retroactivity.*

■ The government and amici argue that Madera's contract and the Reclamation Act always contemplated that Madera would pay the cost of the water, and the subsidy was accidental, so the purpose of the contract is served by the recoupment of the operating and maintenance deficits. We cannot reconcile this argument with the ceiling price in the 1951 contract. When parties contract for a price not to exceed a certain dollar figure, that necessarily carries the implication that the seller bears the risk that its costs will exceed that ceiling. A government contract supported by consideration to pay a subsidy is legitimate and enforceable. *Cf. Alpine Ridge Group v. Kemp,* 955 F.2d 1382, 1383 (9th Cir.1992) (upholding contracts obligating government to subsidize low income housing rents), *cert granted,* — U.S. —, 113 S.Ct. 490, 121 L.Ed.2d 429 (1992). The promise to subsidize if necessary may be an instrument of policy designed to induce people to do things they otherwise would not do, such as transfer water rights and land to the United States, settle in the

West and start a farm, or invest in an existing farm and equipment. We will not construe away the unmistakable term establishing a ceiling price in the 1951 contract on the ground that it granted an unintended subsidy.

■ Nevertheless, we conclude that the recoupment of the operations and maintenance expense does not violate Madera's rights under the 1951 contract. Madera got its water during the forty year term, and need pay no more for the old water than the price to which it agreed. Were it to buy no more water, it would owe no more money for the operations and maintenance expense. The recoupment will be a factor in the price of water under the renewal contract. The price of the new water will be calculated in such a way as to recoup a subsidy previously granted, as though the subsidy were a debt, but the subsidy is not owed like a debt. Madera has no obligation to repay it. The means by which the price of new water will be established looks retroactively at the costs of supplying the old water, but Madera could not be forced to pay the money in the absence of a renewal contract, so it is a charge for new water calculated on the basis of the old water, rather than an additional charge for the old water.

The difference between a retroactive means of calculating the price of new water, and a retroactive charge for the old water, becomes clearer when one thinks about the people to whom Madera will pass on the charges. Most of the farmers who used the more heavily subsidized water during the first two decades of the 1951 contract have probably sold out and retired by now, and some of them have probably died. They are not going to get billed for their share of the operations and maintenance costs deficit. Instead, many of the people to whom they sold their farms will pay more than they expected in the future for water. In practical effect, the recoupment of the operations and maintenance charge is entirely a burden on future rather than past purchasers of water, and largely on those who expected the subsidy rather than those who received it. The

people who got the subsidy can keep the profits they earned from their crops based on the cheaper water, and they can also probably keep, unless their contracts provide otherwise, the money they received from the buyers of their farms attributable to the expected water subsidy. The burden of what the statute calls recovery of a deficit will fall largely on people other than the beneficiaries. The practical effect is a sharp policy shift, arguably disruptive of well-founded expectations, but it is not retroactive.

■ Since the Central Valley Project is a product of policy rather than the market, there is no market measure of the value of the water. Price was a matter of policy, when it was a subsidy to settle the West by turning the deserts green and creating a class of family farmers to populate them, when it was an element in the attempt to revive the economy during the Great Depression, and now, when the subsidy may be eliminated or may flow in the opposite direction, as a tax upon users of the water. For all we know, some supporters of the changes may have felt that farms should turn back into desert, and the West should be depopulated, and saw a policy of raising the price of water beyond cost by an increment representing seller's remorse for the old subsidy as an instrument to achieve this objective. We lack the authority of the political branches to make these sorts of policy choices. Reasonable expectations arising out of past policy but without a basis in cognizable property rights may be honored by prudent politicians, because to do otherwise might be unfair, or because volatility in government policy will reduce its effectiveness in inducing long term changes in behavior. But violation of such expectations cannot give rise to a Fifth Amendment claim. *Peterson v. U.S. Dep't Interior*, 899 F.2d 799, 812–13 (9th Cir.), *cert. denied*, 498 U.S. 1003, 111 S.Ct. 567, 112 L.Ed.2d 574 (1990). Although Congress cannot take back a subsidy for which it has bound itself by contract, it may nevertheless quit subsidizing, and even tax the previously subsidized activity, once its contractual obligation to subsidize ends.

The additional charge for new water does no more than that.

### C. *Higher rates than others.*

■ Madera also pleads that as a result of the government's calculation of the operation and maintenance deficit, it will be required to pay more for water than other Friant Dam districts. The practical effect of a higher maintenance and operations charge against Madera would be that an acre-foot of new water will cost more in the Madera Irrigation District than in some other Central Valley Project districts. ·

We find this the most troubling issue in the case. It is distinct from the retroactivity question. Under the 1939 and 1951 contracts, Madera is entitled to rate equality with other districts on renewal:

> Under this Part A and under succeeding contracts the rates to be charged the District for water service shall not exceed charges made to others than the District for the same class of water and service from Friant Dam and Reservoir.

1951 Contract at 9; *see* 1939 Contract at 13. Our analysis of the retroactivity issue compels the inference that the recoupment must be treated as part of the price for new water, not part of the price for old water. Madera purchasers will pay more per acre-foot for new water under the renewal contract than purchasers in other districts, assuming that Madera's operation and maintenance cost recoupment is higher.

The two general principles of avoiding unconstitutionality and construing contracts to preserve sovereign authority nevertheless compel us to reject Madera's argument. The contractual words, "for the same ... service" preserve Congressional authority to require a different charge for different service. Service requiring more expensive operation and maintenance is different from service requiring less expensive operation and maintenance. The equality promised applies to "rates," and the 1951 contract puts rates in section 7, and operation and maintenance cost in a separate section 15, evidently contemplating in section 16 that the irrigation district would take over operation and maintenance. This suggests that the parties did not intend that Madera's operation and maintenance cost could not exceed that of other districts.

Congress decided in the plainest terms to change its policy, so that instead of buying subsidized water, purchasers of the new water will have to pay its full operation and maintenance costs, plus an increment measured by the subsidy furnished to purchasers of the old water. We are unable to say that by the words, "shall not exceed charges made to others than the District for the same class of water and service," the government's sovereign authority to charge more for water service with a higher operation and maintenance cost was "surrendered in unmistakable terms." *Peterson v. United States Dep't of Interior*, 899 F.2d 799, 807 (9th Cir. 1990), *cert. denied*, 498 U.S. 1003, 111 S.Ct. 567, 112 L.Ed.2d 574 (1990).

### D. *Credits Since 1956.*

Madera also argues that the Secretary errs in accounting for the operations and maintenance costs during the 1951 contract term. A 1956 statute requires that the Secretary credit the district for amounts paid in excess of operation and maintenance costs properly chargeable to that irrigation district. *See* 43 U.S.C. § 485h–1(3) (1988). Madera pleads that the Secretary failed to give it the credits from 1956 to 1988, and then adopted new cost allocation criteria in 1988 which increased the charges to Madera to a rate higher than other districts. The district court correctly pointed out that Madera did not plead entitlement to a credit. Rather, Madera averred these facts in the context of its claim that the operation and maintenance charges were being imposed retroactively and in a manner which generated higher water rates for Madera than other districts. In the context in which it was pleaded, the claim is subsumed by our determination that the recoupment is not an invalid retroactive charge or rate higher than that of other districts. We therefore have no occasion to determine whether the

government correctly computed Madera's share of operating costs and its credits, and the question whether it has is not decided in this lawsuit.

## III. The Environmental Requirements.

The United States has also required a term in Article 14 of the new contract that provides:

> (c)(1) The Secretary has undertaken the San Joaquin Basin Resource Management Initiative, as described in the Federal Register notice of December 29, 1989, 54 Fed.Reg. 53763. (2) The United States and the Contractor [Madera] agree that the Secretary will also complete a programmatic Environmental Impact Statement (EIS) in accordance with the National Environmental Policy Act (NEPA) and a consultation in accordance with Section 7 of the Endangered Species Act (ESA) studying the environmental impacts associated with the execution and renewal of this and other water service contracts in the Friant Unit of the Central Valley Project and with the continued diversion and delivery of water thereunder. The United States and the Contractor further agree that the provisions of this contract are subject to modification by the United States, after public meetings and discussions with the Contractor, in accordance with the results of the final EIS and ESA consultation referenced in the immediately preceding sentence and ESA and NEPA: *Provided,* That the Contractor reserves and does not waive any right it may have to challenge the legality and validity of any such modifications made to this contract pursuant to this subarticle 14(c). Notwithstanding any other provision of this contract (including the preceding sentences of this subarticle), the provisions of this contract covering the right to long-term renewal and quantity of water are non-discretionary and not subject to change except as required by applicable law.

▆▆▆▆ Madera argues that the language, "that the provisions of this contract are subject to modification by the United States, after public meetings and discussions with the Contractor," makes the contract offered to them a nullity, and so deprives Madera of its right to a renewal contract. We agree with Madera's legal proposition, that the government cannot reserve to itself an unlimited right to escape its contractual obligations "without rendering its promises illusory and the contract void." *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756, 760 (1982). Here, though, the reserved power to modify is limited. The modification power is qualified by the words, "in accordance with the results of the final EIS and ESA consultation referenced in the immediately preceding sentence and ESA and NEPA: *Provided,* That the Contractor reserves and does not waive any right it may have to challenge the legality and validity of any such modifications made to this contract pursuant to this subarticle 14(c)." The government, like any contracting party, can enter into a binding agreement subject to a qualified right of modification or other avoidance of obligations. *Cf. Modern Sys. Tech. Corp. v. United States,* 24 Cl.Ct. 699, 701 & n. 3 (1992), (upholding government's exercise of "termination for convenience" clause which permits government to terminate a contract at will), aff'd 980 F.2d 745 (Fed.Cir.1992).

Both of the laws pursuant to which the government reserves rights under the proposed language are new. The National Environmental Policy Act and the Endangered Species Act were promulgated after the 1951 contract was executed, and represent policies subsequently adopted. Madera claims that its renewal rights cannot be burdened with these new policies. That proposition goes too far. The constitutionally permissible burden will depend on what the general policies may turn out to mean in application.

Madera argues that section 203(d) of the Reclamation Reform Act of 1982 prevents the imposition of these environmental regulations. *See* 43 U.S.C. § 390cc(d) (1988). This section provides that—

> Amendments to contracts which are not required by the provisions of this sub-

chapter shall not be made without the consent of the non-Federal party.

*Id.* Madera cannot take advantage of this provision, because the government seeks a term in a new contract, not an amendment to an existing contract. The renewal contract provision in the 1951 contract does not say that all the terms in a renewal contract must be identical to the expired contract. Whether the environmental terms added into the renewal threaten the proprietary rights preserved in Madera's contract, a permanent right to a certain amount of water at rates no higher than those charged to other purchasers of the same class of water and service from Friant Dam and Reservoir, depends on how the environmental provisions are implemented. The government has not " 'surrendered in unmistakable terms' " its power to impose any environmental laws on the contractual relationship, so the required clause is not necessarily violative of Madera's contractual rights. *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52, 106 S.Ct. 2390, 2397, 91 L.Ed.2d 35 (1986) (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982)).

We need not and do not reach the question of what environmental requirements are permissible. As the Department of the Interior has construed it, the new paragraph 14 would not require the environmental impact statement and endangered species consultation prior to signing the renewal contract. The government proposes to renew the contract with the new provision explicitly reserving its authority to impose the requirements of the two environmental acts, subject to Madera's reservation of rights. This evidently is a construction of the "in accordance with" language, inferring from these words that to the extent such review is not required by the statutes, it is not required by the contract. Currently the parties are in litigation in another case, because the Secretary proposes to renew prior to any such environmental review, and the environmental advocacy groups which are intervenors and appellees before us claim in that case that

the environmental review must precede renewal. In light of the government's application of the clause, the question of applicability of the two environmental laws to Madera's renewal contract is not yet a ripe controversy, in the Article III sense, so we lack jurisdiction. *Broughton Lumber Co. v. Columbia River Gorge Com'n*, 975 F.2d 616, 621 (9th Cir.1992).

AFFIRMED.

CYNTHIA HOLCOMB HALL, Circuit Judge, concurring:

I concur in parts I and III of the majority's opinion. As to the issues raised in part II, I concur in the result, but on the ground very ably set forth by the district court: The Appellants' right to purchase water from the government is subject to subsequent legislation affecting the exercise of that right.

" [S]overeign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.' Therefore, contractual arrangements, including those to which a sovereign itself is party, 'remain subject to subsequent legislation' by the sovereign." *Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 52, 106 S.Ct. 2390, 2397, 91 L.Ed.2d 35 (1986) (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148, 147, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982)). "[C]ontracts should be construed, if possible, to avoid foreclosing exercise of sovereign authority." *Id.* 477 U.S. at 52–53, 106 S.Ct. at 2397.

Appellants' asserted property right in the rates set in the 1951 Contract ultimately rests on the argument that by virtue of the 1939 and 1951 Contracts, Congress has surrendered its right to exercise its sovereign power to legislate and the executive's obligation to act in conformance with legislation. Examination of Appellants' contracts fails to disclose the requisite unequivocal surrender of sovereignty. *See Peterson v. United States Dep't of Interior*, 899 F.2d 799, 808 (9th Cir.), *cert. denied*, 498 U.S. 1003, 111 S.Ct. 567, 112

L.Ed.2d 574 (1990). Rather, the language of the contracts appears to reserve Congress' right to exercise its sovereign power. Both provide that they are executed pursuant to the 1902 Federal Reclamation Act and all acts amendatory or supplementary thereto. 1939 Contract at 1; 1951 Contract at 1. The 1939 Contract explicitly recognizes that the Appellants' right to purchase water is subject to both congressional action and implementation by regulation. 1939 Contract at 12, 14.

Appellants point to language in the 1951 Contract providing that the Secretary may set the water rates annually "but *in no event* shall the rates so announced be in excess" of $3.50 and $1.50 per acre-foot for Class One and Class Two water, respectively. 1951 Contract at 13 (emphasis added). This language is insufficient to unmistakably surrender Congress' right to legislate. It is doubtful that the Secretary of the Interior could, by contract, waive the right of Congress to pass laws; but in any case, it does not appear that such a waiver was even contemplated. As stated above, the contracts were made pursuant to the Reclamation Act and statutes amending or supplementing the Act by their own terms. Furthermore, the initial contract recognized that the United States would unilaterally determine the price Appellants would pay for water. 1939 Contract at 12–13. Assuming for the moment that the reference to water rates in the 1951 Contract is even applicable to the imposition of operation and maintenance costs, in this context, the words "in no event" may be interpreted to mean "in no event under the current legislative regime" or "in no event unless Congress legislates otherwise" would the Secretary adjust cost-sharing arrangements.

The Reclamation Act itself required that Appellants pay an appropriate share of operation and maintenance costs. *See* 43 U.S.C. § 485h(e) (1988). Congress amended the Act to require a cost sharing adjustment. *See* Water Resource and Small Reclamation Projects Act, Pub.L. No. 99–546, § 106, 100 Stat. 3050, 3052 (1986). Appellants argument that the rates fixed in a contract made pursuant to statute preclude the government from collecting operation and maintenance costs as clearly compelled by statute cannot prevail.

Similarly, to the extent the charges result in a total water cost to Appellants that exceeds the final cost of water to other users, the contracts allow such a result when brought about by reclamation legislation. This conclusion is further supported by other contractual provisions indicating that the parties intended the district to bear its own operation and maintenance costs for the distribution network extending from the canal. *See* 1951 Contract at 25–27. Thus, the district must have contemplated that its bottom-line water cost would differ in some respects from the absolute water cost of other users of Friant Dam water. The contract must be interpreted to require only that the rate per acre-foot of water is the same to each irrigation water user. Even if the contracts did not explicitly acknowledge that they were subordinate to statute, the doctrine of reserved sovereign power would compel the same conclusion. The language of the contracts does not unequivocally surrender congressional power to charge the district for the actual cost of operating and maintaining the Madera Canal.

Accordingly, the district court's order should be affirmed.